EMPIRE STATE BANK, Relator,

v.

LYON COUNTY, Respondent.

No. C0–89–1497.

Supreme Court of Minnesota.

May 4, 1990.

Paul Stoneberg, Christianson, Stoneberg, Giles & Myers, Marshall, for relator.

Benjamin J. Smith, Smith, Gendler & Shiell, Minneapolis, and Dave Peterson, Lyon County Atty., Marshall, for respondent.

## OPINION

COYNE, Justice.

Certiorari on the relation of Empire State Bank to review a decision of the Tax Court determining that the estimated fair market value of the bank property on January 2, 1987 was $545,000. Relator contends that the bank's property was unequally assessed and that the factual finding of fair market value was clearly erroneous. We

disagree with the relator and affirm the decision of the Tax Court.

In 1981, relator constructed the new bank building which is the subject of this challenge, at a cost of $1,050,000. Located in the small agricultural town of Cottonwood, the building is of contemporary architectural design and includes a main floor, basement and mezzanine comprising approximately 16,000 square feet. Its unique features include a 200–300 square foot vault, bullet proof glass, a night depository and two drive-up teller lanes.

In 1987, the Lyon County assessor issued a statement of property tax payable in 1988, estimating the market value of the bank property at $605,000. Relator challenged the assessment, contending not only that the estimated market value was greater than the property's actual market value as of the assessment date, but also that the property was unequally assessed when compared with other similar property. The bank took the position that it, as other businesses in Cottonwood and similar rural communities, had been greatly affected by the depressed farm economy of the 1980's and that, because it relied so heavily on farm operating loans for business, it suffered $750,000 in losses during the period from 1983 through 1986. In its view, as a practical matter and under these circumstances, the bank property simply could not support an appraisal of $605,000.

At the hearing before the Tax Court, the county appraiser discussed the applicability of both the sales comparison approach and the cost replacement approach to determine the estimated fair market value of the property. The sales comparison approach produces an estimate of the property value by comparing it to other recent sales of similar property. However, because the appraiser could only identify six similar sales in the geographical area and because those sales were often the product of economic duress, he concluded that the sales comparison approach would not be as accurate as necessary. The cost replacement approach considers the current cost of reproducing the property less the depreciation from physical deterioration, functional obsolescence and economic obsolescence and is applied most often when valuing property not frequently exchanged in the market. The appraiser characterized the bank property as "special purpose" property with a limited marketability. Because of the special improvements in the building designed to facilitate the bank business, the appraiser concluded that the highest and best use of the building was its present use as a bank. He found no functional obsolescence because the bank continued to be utilized for its original intended purpose by the same occupants, but found severe economic obsolescence in the building because floor space was underutilized and only 60% of the employee space was occupied. Accordingly, the lot on which the building was located was valued at $21,000, and the replacement cost of the building was calculated at $986,879, less a 40% reduction to reflect the economic obsolescence to reach a modified estimated fair market value of the property of $545,000.

The appraiser who testified on behalf of the relator had a considerably different opinion, focusing upon the sales comparison approach to conclude that the fair market value of the bank property was $295,000. While he compared the property to that of three other bank buildings, he acknowledged that with regard to two of the FDIC sales, there was some duress affecting the sales price. He discounted the value of the building by only considering the main floor and one half of the mezzanine, concluding that the basement and the other half of the mezzanine were not used by the bank because they were "super adequate" or overbuilt.

Evaluating this competing testimony, the Tax Court concluded that the county's appraisal method was appropriate because the building was relatively new, was constructed for a "special purpose," and had a limited market. It agreed that the property could not be converted inexpensively into an alternative use and was being utilized at its highest and best use as a bank.

 Relator first contends that the Tax Court erred in rejecting its claim that the assessment was discriminatory, i.e.,

that its property was substantially overvalued because other property of the same class in the same taxing district was systematically or arbitrarily undervalued. *Hamm v. State,* 255 Minn. 64, 70, 95 N.W.2d 649, 654–55 (1959) (overruled in part on other grounds by *United Nat'l Corp. v. Hennepin County,* 299 N.W.2d 73, 76 (Minn.1980)). The burden of proof of unequal or discriminatory assessment is on the petitioning taxpayer. *In re Objection to Real Property Taxes,* 353 N.W.2d 525, 530 (Minn.1984). In describing that burden, this court has held that it is insufficient to show that parcels similar in nature and location were given different assessed values. Instead, the proportion the actual market value of the taxpayer's parcel bears to its assessed value must be compared with the proportions of these two values for other properties. *Anacker v. County of Cottonwood,* 302 N.W.2d 342, 345 (Minn. 1981). A substantial disparity may be proven by sales ratio studies prepared by the Minnesota Department of Revenue to establish a prima facie case of unequal assessment. *Real Property Taxes,* 353 N.W.2d at 532; Minn.Stat. § 278.05, subd. 4 (Supp.1989) (effective for appeals filed after May 25, 1989). The acceptable range of sales prices to values assigned to properties for tax purposes under the sales ratio studies, indicating equal assessments, is a median ratio higher than 90%. Minn.Stat. § 278.05, subd. 4. If the median ratio is lower than 90%, some property owners may not be paying their fair share of the tax burden while others are unfairly forced to bear more than their share of that burden. In those instances, a taxpayer's remedy is to have its assessment reduced by the difference between 90% and the median ratio determined by the court.

■ In the instant case, the county submitted to the Tax Court both 9–month and 12–month sales ratio studies for Lyon County from 1987. The 9–month study was based upon 14 sales of commercial property and had a median ratio of 92.5%. The 12–month study was based upon 16 sales of commercial property and had a median ratio of 93.9%. Unlike most circumstances where a taxpayer would look to

these studies for the support of its claim of disparity, the taxpayer here objected to the use of the sales ratio studies claiming that they were predicated upon an inadequate sample size, Minn.Stat. § 278.04, subd. 4(b), and that they were irrelevant because the samples were taken from much less expensive commercial properties appraised under a different appraisal method. The taxpayer contends that it should be allowed to prove discrimination by comparison to the more narrow category of other "special purpose" properties located in Lyon County.

The Tax Court afforded the relator considerable latitude in its attempt to prove discrimination based upon but two "special purpose" property comparisons and without the aid of the sales ratio studies. Nevertheless, the relator did not sustain its burden of proof; relator failed to introduce completed appraisals or evidence of the actual market value of either property, relying instead on a preliminary appraisal of a single property. By this inability to demonstrate an arbitrary or systematic undervaluation of other properties as compared to the bank's property, the relator has failed to substantiate its claim of constitutional inequality.

■ The relator also complains that the Tax Court's determination that the bank building was a "special purpose" property, justifying appraisal under the cost approach, as well as declining to give the property a discount for functional obsolescence, was clearly erroneous. *See Nagaraja v. Commissioner of Revenue,* 352 N.W.2d 373, 376 (Minn.1984); *Matter of McCannel,* 301 N.W.2d 910, 923–24 (Minn. 1980). We disagree.

As we have indicated, the bank property has a number of characteristics unique to the property designed to facilitate the banking business. There was testimony by the county's appraiser that any conversion of the building to an alternative use would be expensive, citing as an example that such a conversion would in all likelihood require the rewiring of the electrical system and a rerouting of the heating and air

conditioning system. While the bank property may not have been "special purpose" in every respect, the structure, character and design of the building for use as a bank dominates and, in this regard, the assessor's exclusive reliance on the cost approach, as approved by the Tax Court, was not clearly erroneous. *Federal Reserve Bank of Minneapolis v. State*, 313 N.W.2d 619, 624 (Minn.1981).

 Neither are we persuaded that the taxpayer has sustained its burden of establishing an entitlement to a discount for the functional obsolescence of the property. We have noted on a prior occasion that functional obsolescence is "the inadequacy or obsolescence of a facility due to developments which have made it incompetent to perform its function properly or economically, * * * or the inability of a structure to perform adequately the function for which it is *currently* employed." *McCannel*, 301 N.W.2d at 924 n. 9 (emphasis added in *McCannel*) (quoting *Congregation of the Sons of Israel v. State*, 54 A.D.2d 794, 804, 387 N.Y.S.2d 738, 749 (1976), and *Real Estate Appraisal Termi-*

*nology*, 74 (B. Boyce ed. 1975)). However, while the record would indicate that the property, under current economic circumstances, may have been overbuilt, the "superadequacies" do not prevent the structure from performing adequately the function for which it is presently employed. The county did provide a discount for the "economic obsolescence" of the building because designated portions of the bank building were not currently in use under the existing negative business climate. In other words, the county did provide the relator with some relief for an identified obsolescence in the building. We therefore conclude that the estimated fair market value as determined by the Tax Court is not clearly erroneous.

Affirmed.