STATE OF MINNESOTA

IN SUPREME COURT

A14-1883
A14-2168

Tax Court                                                          Wright, J.
                                               Took no part, Lillehaug, J.

Guardian Energy, LLC,

                    Relator,

vs.                                                      Filed:  August 12, 2015
                                                    Office of Appellate Courts
County of Waseca,

                    Respondent.

_____

Thomas R. Wilhelmy, Jennifer A. Kitchak, Fredrikson & Byron, P.A., Minneapolis, Minnesota, for relator.

Marc J. Manderscheid, Michael M. Sawers, Briggs and Morgan, P.A., Minneapolis, Minnesota; and

Brenda Miller, Waseca County Attorney, Waseca, Minnesota, for respondent.

Robert Small, Executive Director, Minnesota County Attorneys Association, Saint Paul, Minnesota; and

John March, Senior Hennepin County Attorney, Jane N.B. Holzer, Thomas F. Pursell, Assistant Hennepin County Attorneys, Minneapolis, Minnesota, for amicus curiae Minnesota County Attorneys Association.

_____

S Y L L A B U S

1.     The tax court's determination that the ethanol-plant tanks are taxable real property is not clearly erroneous.

2.	The tax court's valuation of the ethanol plant is not reasonably supported by the evidence as a whole because the tax court based its calculation of external obsolescence on an analysis that is not supported by the record and failed to adequately explain the method it used to calculate external obsolescence.

Affirmed in part, vacated in part, and remanded.

O P I N I O N

WRIGHT, Justice.

In a proceeding before the Minnesota Tax Court, relator Guardian Energy, LLC, challenged respondent Waseca County's assessment of the value of its ethanol-production facility. In this appeal from the tax court's order for judgment, Guardian Energy argues that the tax court erred by (1) classifying 27 tanks[1] used in the ethanol-production process as taxable real property and (2) determining the fair market value of the property based on an analysis of external obsolescence that is unsupported by the record. We affirm the tax court's determination that the tanks are taxable real property. But because the tax court failed to adequately explain its calculation of external obsolescence, and based that calculation on an analysis that is not supported by the record, we vacate the tax court's valuation of the facility and remand for further proceedings.

---

[1]	The term "tanks" refers to the various tanks and distillation columns that are used in the ethanol-production process at Guardian's facility.

2

I.

The property at issue in this appeal is Guardian Energy's ethanol-production facility located on 141 acres in Janesville. The plant converts field corn into ethyl alcohol (ethanol). Guardian Energy, a joint venture of six midwestern ethanol entities, purchased the nearly completed plant in 2009 for $92 million after the former owners filed for bankruptcy during its construction. Guardian Energy completed construction of the plant and commenced operations in October 2009. The property consists of three adjoining tax parcels that contain an industrial complex of buildings, tanks, distillation columns, wells and septic systems, a rail spur, and other land improvements.

The Waseca County Assessor estimated that the market value of the property was $24,167,100 as of January 2, 2009; $22,157,600 as of January 2, 2010; and $26,564,200 as of January 2, 2011. Guardian Energy challenged the assessments by filing timely petitions with the tax court. *See* Minn. Stat. § 278.01, subd. 1 (2014). In 2012, the parties filed cross-motions for partial summary judgment to resolve whether certain tanks at the plant were taxable. After a two-day hearing in January 2013, the tax court concluded that the disputed tanks were taxable real property[2] within the meaning of

---

[2]    The tax court issued its initial order on February 21, 2013. Guardian Energy moved for reconsideration, and the tax court amended its memorandum in support of its findings of fact and conclusions of law several months later. *Guardian Energy, LLC v. Cty. of Waseca*, No. 81-CV-10-365, 2013 WL 684242, at *1 (Minn. T.C. Feb. 21, 2013) *reconsideration granted in part*, No. 81-CV-10-365, 2013 WL 8719413 (Minn. T.C. July 9, 2013).

3

Minn. Stat. § 272.03, subd. 1 (2012).[3] The matter proceeded to trial in February 2014 to determine the fair market value of Guardian Energy's facility, and both parties introduced expert appraisal testimony. Guardian Energy's expert, Robert Strachota of the Shenehon Company, valued the property at $20,320,000 as of January 2, 2009; $20,120,000 as of January 2, 2010; and $19,690,000 as of January 2, 2011. Waseca County's expert, Clay Dodd of Patchin Messner Dodd & Brumm, valued the property at $26,590,000 as of January 2, 2009; $29,100,000 as of January 2, 2010; and $33,990,000 as of January 2, 2011.

After receiving the parties' post-trial briefs, the tax court issued its findings of fact and conclusions of law in September 2014. Following Guardian Energy's motion for amended findings of fact, conclusions of law, or new trial, the tax court issued amended findings of fact, conclusions of law, and an order for judgment in December 2014.[4] The

---

[3] The Legislature amended Minn. Stat. § 272.03, subd. 1, in 2014 to provide that the exterior shell of a structure used in the production of biofuels, wine, beer, distilled beverages, or dairy products, is not included in the definition of real property, even when the shell has structural, insulation, or temperature control functions. Act of May 20, 2014, ch. 308, art. 2, § 9, 2014 Minn. Laws 1875, 1892-93 (codified at Minn. Stat. § 272.03, subd. 1(c)(iii) (2014)). The exterior shell of the structure, however, is real property when it is used primarily for storage of ingredients or materials used in the production of biofuels, wine, beer, distilled beverages, or dairy products, or the storage of those finished products. *Id.* This amendment is effective beginning with assessment year 2015. *Id.* As did the tax court, we rely on the pre-amendment version of the statute to determine the taxable nature of the tanks.

[4] Before the tax court issued its amended findings of fact, conclusions of law, and order for judgment in December 2014, judgment was entered inadvertently. Guardian appealed that judgment to preserve its right to appeal. Guardian subsequently filed a separate appeal from the December 2014 order of the tax court. We consolidated the two appeals in our January 8, 2015 order.

tax court determined that the fair market value of the property was higher than the parties' appraisal evidence presented at trial. *See Guardian Energy, LLC v. Cty. of Waseca*, No. 81-CV-10-365, 2014 WL 7476215 (Minn. T.C. Dec. 9, 2014).

A summary of the fair market values, as proposed by the parties and as found by the tax court, is as follows:

| Year | County Assessment | Guardian Energy's Expert at Trial | County's Expert at Trial | Tax Court Amended Order |
|------|-------------------|-----------------------------------|--------------------------|-------------------------|
| **2009** | $24,167,100 | $20,320,000 | $26,590,000 | $36,379,100 |
| **2010** | $22,157,600 | $20,120,000 | $29,100,000 | $34,834,200 |
| **2011** | $26,564,200 | $19,690,000 | $33,990,000 | $38,593,000 |

In determining the fair market value, the tax court used a cost approach to valuation that considered the value of the land, plus the replacement cost of the improvements to the land, with deductions for depreciation based on external obsolescence.[5] The tax court's estimated replacement cost for the real property, the replacement cost new (RCN), was within the ranges of the replacement costs calculated by the appraisers. However, in deducting for external obsolescence, the tax court rejected

_____

[5]   External obsolescence refers to a type of depreciation understood generally as a "loss in value caused by . . . factors outside a property." Appraisal Inst., *The Appraisal of Real Estate* 632 (14th ed. 2013). The causes of external obsolescence "can be broadly characterized as either market obsolescence or locational obsolescence." *Id.* at 633 (emphasis omitted). Locational obsolescence "is caused by proximity to some detrimental influence on value such as heavy traffic, a landfill, or other undesirable land use." *Id.* Market obsolescence is the "result of the natural expansion and contraction of the real estate market." *Id.* Only market obsolescence is at issue in this appeal.

the analysis of both parties' appraisers and calculated a level of external obsolescence that was considerably lower than the estimates that Guardian Energy and the County submitted at trial. This calculation resulted in a final assessed value for each tax year that was significantly higher than the values proposed by either party. Guardian Energy sought review by our court, challenging the tax court's determination that the tanks on the property are taxable real property and the tax court's calculation of external obsolescence.

Our review of the tax court's decision is limited to determining whether the tax court had jurisdiction, whether its decision is supported by the evidence, and whether it committed an error of law. *444 Lafayette, LLC v. Cty. of Ramsey* (*444 Lafayette II*), 830 N.W.2d 25, 29 (Minn. 2013); *see* Minn. Stat. § 271.10, subd. 1 (2014). We review the tax court's legal conclusions de novo, but we defer to the tax court's market value determinations unless they are clearly erroneous. *See Eden Prairie Mall, LLC v. Cty. of Hennepin* (*Eden Prairie II*), 830 N.W.2d 16, 20 (Minn. 2013); *Cont'l Retail, LLC v. Cty. of Hennepin*, 801 N.W.2d 395, 398 (Minn. 2011). The tax court's value determinations are clearly erroneous when they are not reasonably supported by the record as a whole. *Equitable Life Assurance Soc'y of the U.S. v. Cty. of Ramsey*, 530 N.W.2d 544, 552 (Minn. 1995). Accordingly, we will not defer "to the tax court's valuation determination when the tax court has clearly misvalued the property or has failed to explain its reasoning." *Cont'l Retail, LLC,* 801 N.W.2d at 399.

II.

We first address Guardian Energy's argument that the tax court erred when it determined that certain tanks at the facility are taxable real property.[6] The tax court began its valuation analysis by identifying the structures on the land that are subject to taxation. Although the parties agreed that the land and the buildings on the land are taxable real property, they disagreed about whether 27 tanks are taxable. The disputed tanks serve various functions in the ethanol-production process and, in general, are bolted

_____

[6] Guardian also argues on appeal—contrary to its position at trial—that it failed to present sufficient evidence to rebut the prima facie validity of the County's assessment and, as a result, the County's original assessment should stand. A county's presumptively valid tax assessment, Minn. Stat. § 271.06, subd. 6 (2014), may be successfully challenged with credible evidence that the assessor's estimated market value is incorrect, *S. Minn. Beet Sugar Coop. v. Cty. of Renville* (*SMBSC*), 737 N.W.2d 545, 558-59 (Minn. 2007). Here, in response to Guardian's attempt at trial to rebut the County's market valuation, the County conceded that it was not defending its initial assessment because it had failed to include certain taxable items in that assessment. The tax court correctly concluded that Guardian had successfully rebutted the presumption of validity.

Guardian now argues that the tax court could not both reject almost all of Guardian's evidence regarding valuation and find that Guardian had produced "credible evidence" to rebut the presumption of prima facie validity. We disagree. The record establishes that Guardian and the County agreed at trial that the County's original assessment was not valid. This agreement between the parties stands. *See Minn. Vikings Football Club, Inc. v. Metro. Council*, 289 N.W.2d 426, 430 (Minn. 1979) ("It would be impossible for a court system to function if the representations of attorneys, particularly in the presence of and with the acquiescence of their clients, could not be relied upon."). Moreover, Guardian presented sufficient evidence to overcome the presumption of prima facie validity afforded to the assessor's estimated market value for the subject property, even if that evidence was insufficient for purposes of valuation. *See SMBSC,* 737 N.W.2d at 590 ("[T]o overcome the presumed validity of the county's estimated market value, [a taxpayer] need not necessarily put forth evidence that would allow the tax court to determine the market value of the subject property. Rather, [a taxpayer] need only put forth evidence to show that the county's assessed value does not reflect the true market value of the property.").

to or sit on concrete foundations or piers. The tax court concluded that all of the disputed tanks are taxable real property. *Guardian Energy, LLC v. Cty. of Waseca*, No. 81-CV-10-365, 2013 WL 8719413 (Minn. T.C. July 9, 2013).

All real and personal property is taxable unless otherwise exempt. Minn. Stat. § 272.01 (2014). Minnesota Statutes § 272.03, subd. 1(a) (2012), broadly defines " 'real property' " for taxation purposes as "the land itself . . . and all buildings, structures, and improvements or other fixtures on it." *See also S. Minn. Beet Sugar Coop. v. Cty. of Renville* (*SMBSC*), 737 N.W.2d 545, 551 (Minn. 2007). However, the tools, machinery, and equipment used in the property's production activity or business are excluded from the definition of real property. Minn. Stat. § 272.03, subd. 1(c)(i). But this exclusion for equipment and machinery does not apply to structures with exterior shells that have "structural, insulation, or temperature control functions or provide[] protection from the elements." Minn. Stat. § 272.03, subd. 1(c)(iii). Such structures are taxable real property.

We most recently addressed the application of section 272.03, subdivision 1, to industrial tanks in *SMBSC* when we affirmed the tax court's conclusion that 30 tanks, bins, and silos at a sugar beet processing plant were taxable real property. 737 N.W.2d at 550, 552-54. In so holding, we outlined the three steps necessary to determine whether such tanks are taxable real property:

> The first step is to determine if the property at issue falls within the broad definition of real property in subdivision 1(a). The second step is to determine whether the exclusion in subdivision 1(c)(i) applies. And the third step is to determine whether the exception to the exclusion, set forth in subdivision 1(c)(iii), applies.

8

*Id.* at 552. Applying section 272.03, subdivision 1, to the present case, the first step is to determine whether the tanks are real property. Second, if the tanks are equipment or machinery, they are excluded from the definition of real property and therefore are not taxable unless the exception applies. Third, tanks that otherwise would be excluded as machinery or equipment are taxable real property if they have an exterior shell that "constitutes walls, ceilings, roofs, or floors if the shell . . . has structural, insulation, or temperature control functions or provides protection from the elements." Minn. Stat. § 272.03, subd. 1(c)(iii).

Here, the tax court expressly relied on the analytical framework articulated in *SMBSC* to determine whether the disputed tanks are real property. First, the tax court determined that all of the disputed tanks (1) fall within the broad definition of real property; (2) are structures within the meaning of subdivision 1(a); and (3) because they are attached to concrete foundations, "sit[] on the land" within the meaning of that section. *See id.*, subd. 1(a) ("[R]eal property includes . . . all buildings, structures, and other improvements or fixtures on [the land] . . . ."). For those tanks that are located within buildings, the tax court determined that they are permanent additions to the facility and are an integral part of the plant's ethanol production process within the meaning of Minn. Stat. § 272.03, subd. 1(b) ("A building or structure shall include . . . all improvements or fixtures annexed to the building or structure, which are integrated with and of permanent benefit to the building or structure.").

Guardian Energy contends that the tax court erred in this first step of the *SMBSC* analysis. According to Guardian Energy, because the tanks are attached to concrete slabs, they are not on the land as required under subdivision 1(a). Guardian Energy also argues that the tanks are moveable and, therefore, are not integrated and permanent under subdivision 1(b). Thus, the tax court erred, Guardian Energy argues, by determining that the tanks are taxable real property under step one of the *SMBSC* analysis. We disagree.

As the tax court correctly explained, under Guardian Energy's theory, it is difficult to imagine what structures, other than those "sitting directly on the earth itself," could *ever* constitute real property. Guardian Energy's arguments fail to account for our holding in *Crown CoCo, Inc. v. Commissioner of Revenue*, 336 N.W.2d 272, 273-74 (Minn. 1983), in which we concluded that a canopy that sheltered gas station pumps and was "bolted to concrete footings" was a "structure" subject to taxation. Guardian Energy's contention that the tanks are not "permanently affixed" to the land because theoretically they could be removed (either by detaching them from their foundations and then disassembling them or by towing the tanks away) fares no better. Permanency is not synonymous with perpetuity, nor does it require the physical *impossibility* of removal. *See, e.g.*, *Barton Enters., Inc. v. Cty. of Ramsey*, 390 N.W.2d 776, 777-78 (Minn. 1986) (affirming the tax court's conclusion that two oil tanks were real property subject to taxation despite being used tanks that were purchased by petitioner and moved to their present site); *Veolia ES Rolling Hills Landfill, Inc. v. Cty. of Wright*, No. 86-CV-06-6446, 2007 WL 4845558, at *6 (Minn. T.C. Nov. 21, 2007) (concluding that a landfill liner was

10

an improvement to real property because even though "it is physically possible to remove the liner from its present site, its removal is unlikely").

The tax court correctly concluded that the disputed tanks fall within the definition of real property in subdivision 1(a) and (b). *See SMBSC*, 737 N.W.2d at 552 (noting that the definition of real property in section 272.03, subdivision 1(a) is broad enough to include objects that resemble equipment); *Barton*, 390 N.W.2d at 777 (concluding that oil tanks were taxable as real property because part of their function was to contain and shelter petroleum products); *KDAL, Inc. v. Cty. of St. Louis,* 308 Minn. 101, 103, 240 N.W.2d 560, 561 (1976) ("The terms 'structure' and 'equipment' are not mutually exclusive.").

Having determined that the tanks are real property under step one, the tax court turned to the second step of the *SMBSC* analysis. Under the second step, the tax court considered whether the tanks fall within the definition of equipment under subdivision 1(c)(i) and, therefore, are excluded from taxation. To satisfy the definition, the tanks must be "machinery . . . and equipment attached to or installed in real property for use in the business or production activity conducted thereon." Minn. Stat. § 272.03, subd. 1(c)(i). "To be exempt as equipment, an item must perform functions distinct and different from the functions ordinarily performed by buildings and other taxable structures." *Crown CoCo, Inc.*, 336 N.W.2d at 274. The tax court determined, and we agree, that 13 of the 27 tanks are not excluded as equipment or machinery, and thus, remain taxable real property. However, the tax court found that, because of the production activity of the remaining 14 tanks, these tanks meet the definition of

11

machinery and equipment under subdivision 1(c)(i). Therefore, these 14 tanks are excluded from taxation as real property unless, under the third step of the *SMBSC* analysis, the exception to the exclusion applies.

Finally, under the third step of the *SMBSC* analysis, the tax court considered whether the 14 tanks that are excluded as equipment under subdivision 1(c)(i) nonetheless should be considered taxable real property because their exterior shells have "structural, insulation, or temperature control functions or provide[] protection from the elements." Minn. Stat. § 272.03, subd. 1(c)(iii). The tax court concluded that the exterior shells of the otherwise-excluded tanks have structural, insulation, or temperature-control functions; provide protection from the elements; or perform a structural function by preventing their contents from escaping. *See SMBSC*, 737 N.W.2d at 553 (concluding that the tax court did not clearly err when it found that various tanks, bins, and silos located at a sugar beet processing facility "perform[ed] a structural function" and therefore were not excluded from taxation).

The record supports the tax court's factual findings that the tanks are real property under Minn. Stat. § 272.03, subd. 1(a)-(b), and that those tanks that might be excluded from taxation as equipment are nevertheless still taxable because their exterior shells have "structural, insulation, or temperature control functions or provide[] protection from the elements." *Id.*, subd. 1(c)(iii). Because the tax court did not clearly err in its legal analysis, we affirm the tax court's determination that the 27 tanks are real property subject to taxation.

12

## III.

We next consider whether the tax court's market-valuation conclusions are supported by substantial evidence in the record. Guardian Energy argues that the tax court erred when it "employed an analysis of external obsolescence that was not supported by the appraisal testimony in the record, and as a result, [reached] values significantly higher than the range of the appraisal evidence."

## A.

Before we address the matter of external obsolescence, we review the appraisal approach used by the tax court. For taxation purposes, real property typically is assessed at its "market value." Minn. Stat. § 273.11, subd. 1 (2014). "Market value" is represented by "the usual selling price," namely, "the price which could be obtained at a private sale or an auction sale, if it is determined by the assessor that the price from the auction sale represents an arm's-length transaction." Minn. Stat. § 272.03, subd. 8 (2014). Generally, we have recognized three approaches to appraising real property to determine its market value: (1) the sales-comparison approach, which compares the subject property to similar properties recently sold in actual market transactions; (2) the cost approach, which estimates the current cost to construct a reproduction of the subject property; and (3) the income-capitalization approach, which capitalizes the income the subject property is expected to generate over the relevant time period. *Cont'l Retail, LLC*, 801 N.W.2d at 402; *SMBSC*, 737 N.W.2d at 555; *see also* Appraisal Inst., *The Dictionary of Real Estate Appraisal* 17, 67, 143, 255 (4th ed. 2002) (listing the same three methods).

13

After engaging in a comprehensive examination of the three approaches, the tax court determined that the cost approach provides the most reliable indicator of the value of Guardian Energy's property. Neither party has challenged the tax court's use of this approach.[7] While appraisers should apply at least two approaches to value when possible, *Equitable Life Assur. Soc'y of the U.S.*, 530 N.W.2d at 553, a tax court can "rely exclusively on the cost approach when valuing special purpose property" such as an ethanol plant.[8] *SMBSC*, 737 N.W.2d at 556; *see also In re McCannel,* 301 N.W.2d 910, 924 (Minn. 1980) ("The very nature of special purpose property is such that market value cannot readily be determined by the existence of an actual market, and therefore other methods of valuation, such as reproduction cost, must be resorted to."). The cost

---

[7] Guardian's appraiser estimated the property's market value using the three traditional approaches: sales comparison, income capitalization, and cost. The County's appraiser relied primarily on the cost approach, disregarded the income approach, and considered the sales-comparison approach. The tax court rejected the sales approach that Guardian used, concluding that the sales on which Guardian relied were not comparable because they were missing critical data, arose out of a bankruptcy estate, or were part of a stock-purchase transaction. The tax court similarly rejected the County's sales approach. The tax court also rejected Guardian's income approach for reasons that are not at issue in this appeal.

[8] The tax court found, and the parties agree, that Guardian's ethanol plant is a special-purpose property. A special-purpose property is a "property that is treated in the market as adapted to or designed and built for a special purpose." *Fed. Reserve Bank of Minneapolis v. State*, 313 N.W.2d 619, 621 (Minn. 1981). Because of "its unique function or design," a special-purpose property "is not likely to be sold on the market and cannot readily be converted to other uses." *Am. Express Fin. Advisors, Inc. v. Cty. of Carver*, 573 N.W.2d 651, 656 (Minn. 1998). Given the structure, design, and current use of Guardian's property as an ethanol-production facility, we agree that its conversion to another use would not be "economically feasible or practical." *See The Appraisal of Real Estate*, *supra*, at 269. As such, the ethanol plant is properly classified as a special-purpose property.

14

approach is useful for estimating the market value of new or relatively new construction, as is at issue here, and the cost approach is "best applied 'when land value is well supported and the improvements are new or suffer only minor depreciation.' " *Cont'l Retail, LLC*, 801 N.W.2d at 403 (quoting *The Appraisal of Real Estate* 382 (13th ed. 2008)).

The land value determined by the tax court—$8,500 per acre for 2009 and 2010, and $9,000 per acre for 2011—is not at issue on appeal. Further, we are satisfied, based on a careful review of the record, that the tax court's RCN analysis for the taxable improvements at the property is thorough, detailed, and exhibits independent analysis. *See Eden Prairie Mall, LLC v. Cty. of Hennepin* (*Eden Prairie I*), 797 N.W.2d 186, 195 (Minn. 2011) (holding that a tax court's " 'findings should reflect the court's independent assessment of the evidence' " (quoting *In re Children of T.A.A.*, 702 N.W.2d 703, 707 n.2 (Minn. 2005))). Because it found the estimates of the County's expert appraiser to be more reliable and credible than Guardian Energy's, the tax court's RCN for the real property at issue is supported by the evidence in the record.[9]

B.

We now address the calculation of external obsolescence. With the total RCN of the real property calculated, the tax court next determined the amount of depreciation to

---

[9] The tax court concluded that, as of January 2, 2009, the estimated RCN for the real property was $41,878,560. Guardian's total estimated RCN for that date was $34,170,000; Waseca's total estimated RCN was $46,289,348. The difference between the tax court's RCN and the RCN estimates offered by Guardian and the County is $7,708,560 and -$4,410,788, respectively.

deduct from that value. *See Cont'l Retail, LLC*, 801 N.W.2d at 403 (explaining that under the cost approach, "the appraiser determines the current cost of constructing the existing improvements on the property, subtracts depreciation to determine the current value of the improvements, and then adds the value of the land to determine the market value" (citing *Harold Chevrolet, Inc. v. Cty. of Hennepin*, 526 N.W.2d 54, 56 (Minn. 1995))). The three forms of depreciation under the cost approach are physical depreciation, functional obsolescence, and external obsolescence. *Empire State Bank v. Lyon Cty.*, 454 N.W.2d 616, 617 (Minn. 1990). Only the calculation of external obsolescence is at issue here.

Also referred to as economic obsolescence, external obsolescence is "[a]n element of depreciation; a defect, usually incurable, caused by negative influences outside a site and generally incurable on the part of the owner, landlord, or tenant." *The Dictionary of Real Estate Appraisal*, *supra*, at 106. Put differently, external obsolescence is the measurement of a property's loss in value as a result of factors beyond the physical boundaries of the property and beyond the owner's control. External obsolescence "often relates to the business enterprise that operates at the special-purpose property," such that a change in industry conditions could cause the taxpayer to incur a reduction in revenue, profit margin, or return on investment metrics. Robert F. Reilly, *Functional and Economic Obsolescence Procedures in Valuing Industrial Property*, J. Multistate Tax'n & Incentives, Sept. 2012, at 20, 27.

The tax court's analysis of external obsolescence resulted in a percent deduction that was dramatically lower than either party's position at trial, as shown below:

16

| Year | Guardian Energy's Reduction for Obsolescence | County's Reduction at Trial for Obsolescence | Tax Court's Reduction for Obsolescence |
|---|---|---|---|
| 2009 | 33.3% | 45% | 16% |
| 2010 | 33.3% | 35% | 8% |
| 2011 | 33.3% | 25% | 0% |

In financial terms, the stark difference between the tax court's external obsolescence calculation and the parties' positions constitutes millions of dollars in assessed tax value. In 2011, for example, when the tax court deducted *nothing* for external obsolescence, the County's and Guardian Energy's appraisers calculated deductions of $11,141,058 and $5,813,847, respectively.

The tax court was not persuaded that the parties' methods for calculating external obsolescence adequately connected industry-wide market conditions to Guardian Energy's property. Consequently, after rejecting each party's method, the tax court employed an entirely different method of calculating external obsolescence, using evidence derived from the record. Guardian Energy argues that the tax court's calculation of external obsolescence is clearly erroneous because neither the tax court's method for analyzing external obsolescence, nor the resulting market values, are supported by the appraisal testimony in the record.

1.

Minnesota Statutes § 278.05, subd. 1 (2014), instructs the tax court to "hear and determine the claims, objections or defenses made by the petition and . . . direct judgment to sustain, reduce or increase the amount of taxes due." The tax court may arrive "at a value determination that is lower or higher than the appraisal testimony presented at trial," *Eden Prairie I*, 797 N.W.2d at 194, and need not accept the valuation of either appraiser, *Am. Express Fin. Advisors, Inc. v. Cty. of Carver*, 573 N.W.2d 651, 658 (Minn. 1998). But when the tax court rejects the testimony of both appraisers, the tax court must indicate the basis for its calculation and adequately explain its rationale and the factual support in the record for its conclusions. *444 Lafayette, LLC v. Cty. of Ramsey* (*444 Lafayette I*), 811 N.W.2d 106, 107 (2012). In *Eden Prairie I*, we observed:

> [T]he tax court brings its own expertise and judgment in valuation matters, and its determination need not be the same as the appraisal testimony. But market value determinations involve the exercise of complex and sophisticated judgments of market conditions, anticipated future income, and investor expectations, particularly with respect to income-producing properties such as the subject properties here. When the tax court concludes that the market value of a subject property is lower or higher than the appraisal testimony, *it should carefully explain its reasoning for rejecting the appraisal testimony* and the grounds for adopting a lower or higher value, and *adequately describe the factual support in the record for its determination*. If the court fails to do so, it runs the risk of having its determination overturned.

797 N.W.2d at 194 (emphasis added).

Both parties' appraisers agreed that, on the three dates of valuation, the subject property suffered from external obsolescence caused by prevailing negative industry conditions. The tax court explained that a taxpayer's burden in proving external

18

obsolescence " 'requires a showing of the cause of the asserted obsolescence and proof that it affects the value of the subject property.' " *Guardian Energy, LLC v. Cty. of Waseca*, No. 81-CV-10-365, 2014 WL 7476215, at \*41 (Minn. T.C. Dec. 9, 2014) (quoting *Eurofresh, Inc. v. Graham Cty.*, 187 P.3d 530, 531 (Ariz. Ct. App. 2007)).[10] The *Eurofresh* analytical framework reflects the requirement that external obsolescence, such as that caused by an industrywide product decline, for example, must in fact affect the subject property. 187 P.3d at 538.

Applying this analytical framework, the tax court determined that Guardian Energy was required to "offer probative evidence (1) of the cause of the claimed obsolescence, (2) of the quantity of such obsolescence, and (3) that the asserted cause of the obsolescence *actually affects* the subject property." *Guardian Energy*, No. 81-CV-10-365, 2014 WL 7476215, at \*41 (emphasis added). Because neither party argues that the tax court applied the incorrect analytical framework in this case, we assume, without deciding, that it is the appropriate analytical framework.

At trial, Guardian Energy relied primarily on two facts to support its proposed 33.3-percent reduction for each of the three years at issue—a 40-percent decline in commercial market values generally and an industrywide decrease in the profit margins of ethanol. Guardian Energy's appraiser based his analysis in "significant measure" on industrywide decreases in the profit margin on one gallon of ethanol caused by

---

[10]     The tax court first applied the *Eurofresh* analytical framework for a taxpayer claiming external obsolescence in *American Crystal Sugar Co. v. County of Polk*, No. C1-05-574, 2009 WL 2431376, at \*25 (Minn. T.C. Aug. 5, 2009), *amended*, No. C1-05-574, 2009 WL 5064334 (Minn. T.C. Dec. 21, 2009).

overcapacity, lower demand, and the increased price of corn. When Guardian Energy's ethanol plant was under construction in 2007 and 2008, the nationwide profit margin of ethanol was forecasted to be approximately $1 per gallon. But between 2008 and 2011, actual margins dropped by more than one-half nationwide, to $0.45. The tax court found, however, that Guardian Energy's ethanol margins "averaged $.666 per gallon across 2010 and 2011" and that Guardian Energy had admitted that its profit margins were stronger than the national averages.

The tax court rejected Guardian Energy's reliance on commercial market values as an appropriate measure of obsolescence because Guardian Energy failed to connect industrywide trends to the subject property. The tax court reasoned that Guardian Energy did not establish that the value of *this particular* plant declined simply because the market value of other commercial properties declined. Moreover, relying on the 2004 tax court decision in *Pep Boys v. County of Anoka*, the tax court determined that the price per gallon of ethanol was not an appropriate indicator of external obsolescence because the price of ethanol is a function of the "machinery and equipment" installed at the property, which is not part of the taxable real property. *See Guardian Energy*, 2014 WL 7476215, at *43 (citing *Pep Boys v. Cty. of Anoka*, No. C2-01-2780, 2004 WL 2436350, at *6 (Minn. T.C. Oct. 26, 2004) (concluding that "external obsolescence goes to the improvements and/or land, not to the business that occupies the improvements and/or land")).

For its part, the County proposed decreasing reductions for external obsolescence of 45 percent, 35 percent, and 25 percent for the three assessment dates. The County's

appraiser based his estimates on four acquisitions of ethanol plants, all of which were distressed sales by mortgagees who had taken back idling plants. To estimate the external obsolescence inherent in each transaction and to extrapolate it to Guardian Energy's facility, the County's appraiser compared the price paid per gallon of capacity to the cost of construction. The County's appraiser also cited overcapacity and deteriorating profit margins as factors contributing to the property's external obsolescence, but the appraiser decreased the reduction for external obsolescence for 2010 and 2011, as sales of ethanol plants "clearly show[ed] an upward trend in prices after early-to-mid 2009."[11] The tax court rejected this approach, concluding that the County's analysis of the comparable ethanol plant transactions failed to consider the machinery and equipment included in the sales and the differences in market conditions, location, and the quality of improvements.

The tax court concluded that total ethanol production capacity in the United States is the appropriate quantitative standard to measure external obsolescence. *Guardian Energy*, 2014 WL 7476215, at *42. In making its calculation, the tax court relied on

---

[11] In its post-trial briefing, the County offered a different method of calculating external obsolescence based on increasing utilization of ethanol plants industrywide. The County's appraisal evidence at trial indicated that "the number of idled plants in the U.S. was reduced from 21 at the start of 2009, to 11 at the start of 2010. By January of 2011, only one plant was reportedly idle." As of January 1, 2009, 170 of 191 ethanol plants were operating, which is a utilization factor of 89 percent. The utilization rates increased to 94.5 percent and 99.5 percent in 2010 and 2011, respectively. Based on this increase, the County argued that the tax court could use industrywide plant utilization rates as the appropriate measures of external obsolescence for the years at issue, which amounted to significantly lower levels of obsolescence —11 percent, 5.5 percent, and 0.5 percent for the three years at issue. The tax court did not address this analysis in its findings.

federally mandated ethanol blending requirements, drawn from data included in the appraisal reports of both parties. The tax court analyzed external obsolescence by comparing the reported demand for ethanol in the United States with the reported ethanol production capacity in the United States for each year. The tax court considered data in the appraisal reports, which indicated that only about 84 percent of United States ethanol production capacity could be used domestically in 2009, and about 92 percent in 2010. This left 16 percent and 8 percent, respectively, of production capacity unused. The tax court took these measures of unused production capacity—16 percent in 2009; 8 percent in 2010—as the appropriate indicators of obsolescence in the ethanol industry in those years and concluded that there was no evidence of unused production capacity in the market in 2011. Because there was no evidence that Guardian Energy's facility would have had a different level of unused production capacity than the industry as a whole, the tax court applied the level of unused United States production capacity as the measure of the property's external obsolescence—16 percent in 2009, 8 percent in 2010, and 0 percent in 2011.

2.

We conclude that the tax court's calculation of external obsolescence is clearly erroneous because it is not reasonably supported by the record as a whole. *See 444 Lafayette II*, 830 N.W.2d at 29; *Equitable Life Assur. Soc'y of the U.S.*, 530 N.W.2d at 552. To be sure, we expect the tax court to "exercise its own skill and independent judgment," *Eden Prairie I*, 797 N.W.2d at 195, and we discourage the verbatim adoption of a party's market valuations, *see id.*; *see also Lundell v. Coop. Power Ass'n*, 707

22

N.W.2d 376, 380 n.1 (Minn. 2006) (observing that when a court's findings of fact and conclusions of law are identical to the proposed findings and conclusions submitted by a party, a reviewing court cannot determine the extent to which the lower court's decision was independently made); *In re T.A.A.*, 702 N.W.2d at 707 n.2 (observing the same). But these expectations do not allow the tax court to substitute its own measure of external obsolescence that is without support in the record, while completely ignoring the record evidence and the expert appraisal testimony.

Here, the tax court failed to explain adequately why it selected the particular measure of external obsolescence it used—applying capacity alone as a proxy for external obsolescence—and whether such a methodology is an accepted approach.[12] Indeed, with virtually no record support or explanation, the tax court based its entire obsolescence calculation on capacity, while both parties' experts considered capacity as merely one element in the determination of external obsolescence. Moreover, without any explanation, the tax court rejected entirely the decline in ethanol profit margins that both parties' appraisers found to be a primary consideration in determining external

[12] Perhaps by treating capacity as a proxy for external obsolescence, the tax court intended to apply an "inutility" approach, which is a cost-to-capacity measurement of obsolescence. Inutility, a generally accepted method of calculating obsolescence, is estimated by comparing the property's capacity to its use level and adjusting the result for economies of scale. *See* John Corum, *Inutility—an Approach to Calculating Economic Obsolescence*, J. Multistate Tax'n & Incentives, July 2009, at 22. Lower capacity utilization results in lower property values. For example, "if a production facility has the boilerplate capacity to manufacture 10,000 widgets a day, but can only produce 8,000 widgets daily due to market demand, a downward adjustment is made." Robert D. Feder & Anthony Festa, *Application of the Cost Approach,* in *Valuing Specific Assets in Divorce* § 27.07 (2014), Westlaw VALSA.

23

obsolescence.[13]  For a special-purpose property, it is impossible to divorce the property value from the operations of the property itself for purposes of valuation because, by their nature, special-purpose properties "typically have one practical use and no alternative practical uses.  In other words, only one type of business can operate within the special-purpose property."  Robert F. Reilly, *Measuring Economic Obsolescence in the Valuation of Special-Purpose Properties*, Am. Bankr. Inst. J., Sept. 2007, at 36.  The tax court's disregard of declining profit margins is particularly confounding because the capitalization of the income loss attributable to the negative market influences is a generally respected approach to calculating external obsolescence.  *See* Appraisal Inst., *The Appraisal of Real Estate* 635-37 (14th ed. 2013).

---

[13]    Citing *Pep Boys*, the tax court determined that any consideration of increased corn prices resulting in reduced profit margins should not be considered in the calculation of external obsolescence.  This reliance on *Pep Boys* was misplaced.  The analysis in *Pep Boys* is not readily applicable to a special-purpose property such as an ethanol plant.  In *Pep Boys*, the tax court addressed whether the taxpayer's automotive center suffered from obsolescence because its sales volume was lower than projected and did not support the investment.  2004 WL 2436350, at *6.  In that context, the tax court concluded that, while external obsolescence can exist when the market where a property is located is overbuilt and creates an excess supply of competitive properties, "a failure to meet sales projections, does not, by itself, demonstrate that a property suffers from external obsolescence."  *Id.*

Here, in contrast, the tax court was valuing an ethanol plant, which is a special-purpose property that requires corn to operate.  Unlike an ethanol plant, "most warehouses, office buildings, shopping malls and light to medium manufacturing plants may have several alternative uses."  Robert F. Reilly, *Measuring Economic Obsolescence in the Valuation of Special-Purpose Properties*, Am. Bankr. Inst. J., Sept. 2007, at 36, 36.  Thus, unlike a big-box retailer, or a store such as Pep Boys, a special-purpose property is valued precisely *for* its use.  That use necessarily implicates factors that would be specific to the special-purpose property, such as, in this case, the cost of corn as it relates to profit margins.

Although we question the tax court's methodology, we acknowledge the complex and unique valuation challenges in calculating external obsolescence. Thus, while we conclude that a remand is necessary, we do not mandate a particular methodology to apply on remand. Nor do we endorse either party's obsolescence calculation. Indeed, it appears that Guardian Energy did not adequately connect industrywide trends to the value of the subject property. And our decision does not foreclose the possibility that the tax court could properly adopt a methodology that is different from those advanced by either party, if the tax court adequately explains its reasoning and if the evidence as a whole supports the alternative methodology.

## IV.

In sum, the absence of explanation supporting the tax court's method of calculating external obsolescence constrains our substantive review of the adequacy of that methodology. *See, e.g.*, *Eden Prairie II*, 830 N.W.2d at 24 (concluding "that the tax court failed to explain why it fundamentally changed its capitalization methodology or identify supporting appraisal testimony *in the record* for utilizing 6% of the effective tax rate to load the capitalization rate"). Not only is the record devoid of expert-appraisal support demonstrating that capacity, by itself, would be an appropriate method to calculate obsolescence, but also the tax court failed to provide an adequate explanation of its choice of methodology. We, therefore, conclude that the tax court's valuation of the ethanol plant was not reasonably supported by the record as a whole. Accordingly, we vacate the tax court's value determinations for 2009, 2010, and 2011, and remand for

further proceedings consistent with this opinion.  On remand, the tax court may, in its discretion, reopen the record and conduct an additional evidentiary hearing.

Affirmed in part, vacated in part, and remanded.

LILLEHAUG, J., took no part in the consideration or decision of this case.