**CONTINENTAL RETAIL,
LLC, Relator,**

v.

**COUNTY OF HENNEPIN, Respondent.**

No. A11–0345.

Supreme Court of Minnesota.

Aug. 17, 2011.

William R. Skolnick, Amy D. Joyce, Skolnick & Shiff, P.A., Minneapolis, Minnesota, for relator.

Michael O. Freeman, Hennepin County Attorney, Lisa C. Hahn–Cordes, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

## OPINION

DIETZEN, Justice.

Relator Continental Retail, LLC, seeks certiorari review of the market value determinations by the Minnesota Tax Court for a commercial building located in Brooklyn Park, Minnesota, for the assessment dates of January 2, 2006, January 2, 2007, and January 2, 2008. At trial, the tax court increased the market value determinations for all three years. Continental argues that the tax court's value determinations are excessive and not supported by the record over the assessed value of the property. Because we conclude that the tax court's value determinations are supported by the record and are not clearly erroneous, we affirm the decision of the tax court.

Continental Retail owns real property located at 8570 Edinburgh Centre Drive North, Brooklyn Park, Minnesota. Continental is a development company owned and operated by Bradley Hoyt. The subject property consists of approximately 124,432 square feet, and is improved with a multi-tenant building consisting of one floor with a gross building area of approximately 23,325 square feet, and a gross leasing area of approximately 22,767 square feet.

The improvements to the property were constructed in 2004 at an estimated cost of $2,432,195, excluding land, entrepreneurial profit, and other soft costs. Prior to construction of the building, soil corrections were carried out on the property and building pads were prepared. In February 2001, GME Consultants, Inc. prepared a soil assessment and recommended that a Geopier foundational support system be used to prepare the site for the proposed building using the existing building pads. A certificate of occupancy was issued in February 2005. Prior to occupancy of the building by tenants, wall cracks in the fire riser room in the northeast portion of the building were investigated by Fischer Engineering, Inc. The engineer recommended filling the cracks and monitoring the area for further movement.

In 2007, Edina Realty, a tenant of the building, reported to the property manager a physical separation between the ceiling and walls in its lease space. The building maintenance company investigated the problem and submitted a July 2007 report to the property manager that identified three areas of concern related to settlement of soils and movement of building components; however, the company noted that the movement was not a safety issue. Edina Realty vacated its lease space in late 2008 and entered into a settlement to terminate the lease for a lump sum payment of approximately $300,000.

Before it made repairs to the building, the building maintenance company hired American Engineering Testing, Inc., to conduct a building monitoring program. The monitoring program was initiated in September 2007 and continued through the spring of 2009. In 2010, LJM Group, Inc.,

another property consultant, submitted a report outlining the results of their inspection of the property and made several recommendations regarding repairs to address building movement concerns.

The occupancy for the building varied over the three assessment years. The parties stipulated that as of January 2, 2006, 16,653 square feet of the gross leasable area was occupied, for an occupancy rate of 73%. The occupancy rate for the second assessment date was 66%, and the occupancy rate for the third assessment date was 62%.

Continental filed petitions challenging the Hennepin County assessor's estimated market value of $2,216,000 for the January 2, 2006, January 2, 2007, and January 2, 2008 assessment dates. At trial, Continental introduced the expert testimony and appraisal report of Lawrence Kramer. Kramer testified that the value of the property was $1,490,000 on January 2, 2006, $1,340,000 on January 2, 2007, and $1,100,000 on January 2, 2008. Continental also introduced the testimony of, among others, the property owner and the property manager.

Respondent Hennepin County introduced the expert testimony and appraisal report of Shelagh Stoerzinger. Stoerzinger testified that the value of the property was $3,776,600 on January 2, 2006, $3,967,200 on January 2, 2007, and $2,573,400 on January 2, 2008. A summary of the values given to the subject property by the county assessor and each of the experts for the relevant assessment dates are as follows:

| Year | County Assessor | Kramer | Stoerzinger |
|------|-----------------|--------|-------------|
| 2006 | $2,216,000 | $1,490,000 | $3,776,600 |
| 2007 | $2,216,000 | $1,340,000 | $3,967,200 |
| 2008 | $2,216,000 | $1,100,000 | $2,573,400 |

Following trial and the submission of post-trial briefs, the tax court filed its order concluding that the value of the subject property as of January 2, 2006 was $3,776,600, the value as of January 2, 2007 was $3,967,200, and the value as of January 2, 2008 was $2,416,600. Continental subsequently filed a petition for writ of certiorari to this court.

I.

On appeal, Continental argues that the tax court erred in determining that (1) the County's appraiser, Stoerzinger, was qualified to testify as an expert witness; (2) the settling of the building was not a detrimental condition that adversely affected the market value of the property until the January 2, 2008, assessment date; (3) Continental's appraiser, Kramer, did not value the fee simple interest of the property; and (4) the County's appraiser applied the proper approaches to valuing the property.

Our review of a final decision of the tax court is limited and deferential. *See S. Minn. Beet Sugar Coop v. Cnty. of Renville (SMBSC)*, 737 N.W.2d 545, 551 (Minn.2007); *see also Eden Prairie Mall, LLC v. Cnty. of Hennepin*, 797 N.W.2d 186, 192 (Minn.2011). Specifically, a final order of the tax court is reviewable by this court on the grounds that the tax court lacked jurisdiction, that the order is not justified by the evidence or in conformity with the law, or that the order is affected by any other error of law. Minn.Stat. § 271.10, subd. 1 (2010).

Moreover, we review the tax court's legal determinations de novo, and its factual findings under the "clearly erroneous" standard. *SMBSC*, 737 N.W.2d at 551; *see also Montgomery Ward & Co., Inc. v. Cnty. of Hennepin*, 450 N.W.2d 299, 308 (Minn.1990). The tax court's decision is clearly erroneous if the decision is not reasonably supported by the evidence as a whole. *Lewis v. Cnty. of Hennepin*, 623

N.W.2d 258, 261 (Minn.2001). Our deferential review is premised on the separation of powers, and the inexact nature of the appraisal of real property. *Eden Prairie Mall,* 797 N.W.2d at 192. We will not defer, however, to the tax court's valuation determination when the tax court has clearly misvalued the property or has failed to explain its reasoning. *Nw. Nat'l Life Ins. Co. v. Cnty. of Hennepin,* 572 N.W.2d 51, 52 (Minn.1997); *see also McNeilus Truck & Mfg., Inc. v. Cnty. of Dodge,* 705 N.W.2d 410, 414 (Minn.2005).

 Continental argues that Stoerzinger was not qualified to testify as an expert witness. The decision to admit or exclude evidence rests with the tax court, and its rulings will not be disturbed absent an error of law or abuse of discretion. *See TMG Life Ins. Co. v. Cnty. of Goodhue,* 540 N.W.2d 848, 851 (Minn.1995). Rule 702 of the Minnesota Rules of Evidence provides that a qualified expert witness may testify in the form of an opinion so long as the testimony has foundational reliability and is helpful to the fact-finder. Minn. R. Evid. 702. At trial, Continental's counsel objected to Stoerzinger's testimony on the ground that she was not qualified to appraise property with detrimental conditions. Following the tax court's final decision on the merits, Continental did not move for a new trial or amended findings; instead, Continental appealed directly to this court.

 Previously, we have held that a motion for a new trial or amended findings is a prerequisite to appellate review regarding matters of "trial procedure, evidentiary rulings, and jury instructions" that arise "during the course of trial." *Alpha Real Estate Co. v. Delta Dental Plan,* 664 N.W.2d 303, 310 (Minn.2003) (quoting *Sauter v. Wasemiller,* 389 N.W.2d 200, 201 (Minn.1986)) (internal quotation marks omitted). In *Alpha Real Estate,* we ob-

served that a "general demarcation line" could be drawn between the assignment of errors that require a post-trial motion, referring to rulings of the district court that reside within the court's discretion, and substantive questions of law that we review de novo. 664 N.W.2d at 310–11. Thus, evidentiary rulings made at trial must be assigned as error in a motion for a new trial or amended findings in order to properly preserve an objection for appellate review. *Sauter,* 389 N.W.2d at 201. The failure to bring such a motion precludes appellate review. *Id.* at 202. We extended this rule to tax court proceedings in *Carson Pirie Scott & Co. v. Cnty. of Hennepin,* 576 N.W.2d 445, 446–47 (Minn. 1998).

Applying *Alpha Real Estate* and *Sauter,* we conclude that the evidentiary ruling Continental challenges is a matter that required a post-trial motion to preserve it for appellate review. Continental failed to bring a post-trial motion to preserve its evidentiary objection to Stoerzinger's qualification as an expert witness, and therefore appellate review of this issue is precluded.

## II.

 Second, Continental argues that the tax court erred in concluding that the settling of the building was not a detrimental condition that adversely affected the market value of the subject property until the January 2, 2008, assessment date. According to Continental, structural problems to the building existed and were evident as of the earlier assessment dates of January 2, 2006, and January 2, 2007, and these problems adversely affected the market value of the property as of those dates.

Pursuant to Minn.Stat. § 273.11, subd. 1 (2010), all property "shall be valued at the market value of such property." Market

value is defined as "the usual selling price at the place where the property to which the term is applied shall be *at the time of assessment;* being the price which could be obtained at a private sale or an auction sale, if it is determined by the assessor that the price from the auction sale represents an arm's-length transaction." Minn. Stat. § 272.03, subd. 8 (2010) (emphasis added). All taxable property is assessed at its market value on January 2 of the year preceding the year for which taxes are payable. Minn.Stat. § 273.01 (2010). In determining market value for taxation, an assessor must "consider and give due weight to every element and factor affecting the market value." Minn.Stat. § 273.12 (2010); *see also Equitable Life Assurance Soc. v. Cnty. of Ramsey,* 530 N.W.2d 544, 554 (Minn.1995). Generally, those factors logically include detrimental conditions to a building that a willing seller and buyer believe would influence the market value of the property. *See* Minn.Stat. § 272.03, subd. 8; Minn.Stat. § 273.12; *see also* Appraisal Institute, *The Appraisal of Real Estate* 134 (13th ed.2008).

The tax court concluded that the settling of the building was not a detrimental condition that adversely affected the market value of the property until the assessment date of January 2, 2008. The tax court's conclusion is supported by the record. The evidence presented was that the building was constructed using a foundational support system recommended by an engineering consultant. In February 2005, Fischer Engineering evaluated cracks that had developed in the fire riser room in the northeast corner of the building and determined that the cracks could be filled and did not pose a structural safety issue.

In 2007, Edina Realty reported to the property manager problems with their lease space in the northeast part of the building. The property manager noted "doors that weren't shutting properly," "cracks in the drywall in different locations," "water that had come in to the back doors," and a physical separation between the ceiling and walls. The building maintenance company investigated the matter in July 2007 and identified minor issues related to the settling of the building, including shifting of interior walls that negatively affected door alignment and was likely caused by roof movement, and separation between the wall and floor in the break room that was likely caused by the settlement of soils resulting in the sinking of a portion of the concrete floor slab. The company recommended that trim and corner pieces be installed on the ceiling and walls, that the damaged drywall be repaired and painted, and that the doors be adjusted.

Prior to making repairs, the building maintenance company hired American Engineering Testing to conduct a year-long building monitoring program that began in September 2007 and continued through spring 2009. A July 2009 report recommended that the building owner initiate repairs to the subsoils to address the subsidence at the east side of the building. American Engineering also recommended some potential solutions to re-level the walls and floors, and recommended that the wall and roof loads at the corner of the fire riser room be reconfigured.

LJM Group also inspected the property in 2010 and made several recommendations: (1) excavating a test pit near the northeast corner of the building by the rear service door to verify soil conditions and the condition of the footing, and potentially to install additional foundation consisting of helico underpins to support the wall; (2) sand jacking below the floor slab of the Edina Realty lease space to lift the slab to a level condition; (3) replacing the concrete patio adjacent to the Edina Real-

ty lease space; and (4) making interior and exterior finish repairs as necessary.

Although the various consultants identified some minor issues regarding the building before January 2, 2007, serious structural problems that adversely affected market value were not known until September 2007. Thus, the evidence supports the conclusion that the structural problems with the building did not affect market value for the first two assessment years. The tax court's conclusion that the structural problems of the building were not known until September 2007, and therefore did not adversely affect the market value of the property until the third assessment date of January 2, 2008, is therefore supported by the record.

### III.

■ Third, Continental argues that the tax court erred in concluding that Continental's appraiser, Kramer, improperly valued the leased fee interest rather than the fee simple interest of the subject property. Continental asserts that Kramer correctly determined that the leased fee and fee simple interests of the property were equivalent.

Pursuant to Minn.Stat. § 273.11, subd. 1, all property "shall be valued at the market value of such property and not at the value of a leasehold estate in such property, or at some lesser value than its market value." The statute contemplates valuation of the entire, unencumbered interest in the real property, and not a lesser estate. The fee simple interest of the property is the "absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat." *The Appraisal of Real Estate, supra* at 111. It is the "bundle of rights" that constitutes the entire interest in the real property. *Contos v. Herbst,* 278 N.W.2d 732, 737 (Minn.1979). A leased fee interest, however, does not contain the entire, unencumbered interest in the real property. Rather, it is the "ownership interest held by a landlord with the rights of use and occupancy conveyed by lease to others. The rights of the lessor (the leased fee owner) and the lessee are specified by contract terms contained within the lease." Appraisal Institute, *The Dictionary of Real Estate Appraisal* 161 (4th ed.2002). Because the leased fee interest is limited to the current landlord's interest in the property, the leased fee interest is not the entire, unencumbered interest in the real property. *See id.*

The tax court relied, in part, on *TMG* to conclude that Kramer used actual, "as is" rents to value the property, resulting in a valuation of the leased fee interest rather than the fee simple interest. *See TMG,* 540 N.W.2d at 853 (concluding that, to determine the market value of real property under the income approach, market rents, not the actual contract rents, should be used). Kramer's appraisal report specifically states that his discounted cash flow method was a valuation of the "leased fee interest" and valued the property "as-is." Specifically, he testified that he used actual rents because "[c]ontract rents [are] the only thing you can look at in a nonstabilized property." Moreover, the record supports the tax court's conclusion that Kramer did not provide market support for his statement that the leased fee interest was "at or about equivalent to the fee simple estate interest." Consequently, we conclude that the tax court did not err in concluding that Kramer incorrectly valued the leased fee interest in the subject property.

### IV.

■ Fourth, Continental argues that the tax court erred in adopting Stoerzing-

er's valuation conclusions, particularly in giving the sales comparison approach the greatest weight and giving the income approach the least weight. The County asserts that the tax court correctly relied on the sales approach because the income approach had minimal value when vacancy rates were high and part of the property was in shell condition.

We recognize three basic approaches to determining the market value of real property: the cost approach, the market comparison or sales approach, and the income capitalization approach. *Equitable Life*, 530 N.W.2d at 552. Additionally, an appraiser must reconcile the value conclusions under at least two approaches to arrive at a final opinion of market value. *Id.* at 553. Because the process of appraisal is an inexact value determination, the weight placed on each approach depends on the facts of each case. *Id.; see also Carson Pirie Scott*, 576 N.W.2d at 451. To determine whether the tax court's conclusion regarding market value for the three assessment years is supported by the record, we examine the appraisal testimony and the determinations of the tax court as it relates to the three different approaches to valuation.

Under the sales comparison approach, the property is valued based on the price paid in actual market transactions of comparable properties, and then an adjustment to those sales prices is made to reflect differences between the sold property and the subject property. *Kmart Corp. v. Cnty. of Becker*, 709 N.W.2d 238, 240 (Minn.2006). "A major premise of the sales comparison approach is that an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties." *The Appraisal of Real Estate, supra* at 297. Moreover, when a market exists for a subject proper-

ty, that market will provide "the most straightforward and simple way to explain and support an opinion of market value." *Id.* at 300.

Continental argues that Stoerzinger failed to adjust the comparable properties to account for the owner's inability to obtain permanent financing due to a high vacancy rate in the building, and that the comparables should be adjusted accordingly. But the record does not support an adjustment. Notably, Continental's appraiser did not make such an adjustment to his comparable properties. Also, Continental argues that Stoerzinger failed to review the leases of comparable properties to determine the actual rents for these properties. The record, however, indicates that Stoerzinger studied the market to determine market rents, and obtained lease information for the comparable properties.

The income capitalization approach determines the value of income-producing property by capitalizing the income the property is expected to generate over a specific period of time at a specified capitalization yield rate. *Eden Prairie Mall*, 797 N.W.2d at 193. If a property is not presently capable of producing sufficient income to make an accurate valuation, this approach should be accorded less weight than other approaches that may give a better indication of the value of the property. *Cf. The Appraisal of Real Estate, supra* at 563. Stoerzinger used the direct income capitalization approach to estimate market value by determining the net operating income attributable to the property for a period of one year, which was then divided by a capitalization rate to obtain market value.

Continental relies on language in *The Appraisal of Real Estate* to argue that Stoerzinger erred in using the direct capi-

talization approach because the income from the property was not stabilized. *See The Appraisal of Real Estate, supra* at 499 (stating that direct capitalization is "widely used when properties are already operating on a stabilized basis"). Continental's argument lacks merit. The *Appraisal of Real Estate* does not state that the direct capitalization approach should not be used in this circumstance; rather the text merely states that the appraiser should exercise caution. *See id.* (noting that the direct capitalization method "may be less useful for properties going through an initial lease-up or when income or expenses are expected to change in an irregular pattern over time"). Here, Stoerzinger concluded that the income approach was entitled to minimal weight because of the high vacancy rate and lack of income from the property. The tax court's determination that Stoerzinger's conclusions regarding the income approach were reasonable finds support in the record.

 Under the cost approach, the appraiser determines the current cost of constructing the existing improvements on the property, subtracts depreciation to determine the current value of the improvements, and then adds the value of the land to determine the market value. *Harold Chevrolet, Inc. v. Cnty. of Hennepin,* 526 N.W.2d 54, 56 (Minn.1995). The cost approach is useful for estimating the market value of new or relatively new construction, and is best applied "when land value is well supported and the improvements are new or suffer only minor depreciation." *The Appraisal of Real Estate, supra* at 382. The cost approach is also relied on when market or income data is unavailable. *See Lewis & Harris v. Cnty. of Hennepin,* 516 N.W.2d 177, 180 (Minn. 1994) (concluding that the tax court did not err in relying on the cost approach when

the market comparison approach "left a good deal to be desired").

Both appraisers adjusted the land value in the cost approach to reflect the differences between the comparable properties and the subject land. Kramer adjusted each comparable property down by 30–35% to account for adverse soil conditions on the subject property. Stoerzinger adjusted each comparable property down by 5% unless the comparable property also needed additional soil corrections for development.

The tax court adopted Stoerzinger's conclusions reconciling the relative weight to be given to the three approaches to value. Stoerzinger determined that the cost approach must be given greater weight because the building was fairly new as of the assessment dates, and the sales comparison approach was also a good indicator of market value. Stoerzinger did not rely on the income approach on the ground that investors would not rely on the direct capitalization method to value this property due to the newness of the building and the high vacancy rate. The tax court concluded that Stoerzinger's opinion of market value for the assessment years was persuasive. While we may have reached different conclusions of fair market value for the subject property on this record, we cannot say that the tax court's conclusions are clearly erroneous.

Affirmed.

ANDERSON, G. BARRY, Justice (concurring).

Because I agree that Continental's challenge to the qualifications of the County's expert witness, Shelagh Stoerzinger, is precluded from appellate review as a result of Continental's failure to bring the

appropriate post-trial motion, I concur with the majority opinion. It is also not clear that the ultimate result in this dispute would have been different had the court declined to admit the expert testimony, and we need not decide that issue here.

That said, I write separately to emphasize that, while the tax court has significant discretion in the admission of expert witness testimony, that discretion is not unlimited.[1] Here, for unexplained reasons, the tax court allowed expert testimony from the County's witness on issues related to detrimental real estate conditions in the face of an almost complete failure of proof by the County that the witness was in any way qualified to testify on these issues.

How complete was that failure? Not only did the witness admit she had no experience in appraising properties with detrimental conditions, apart from conversations she claims to have had with unidentified peers, the only evidence in the record of an attempt to bolster her qualifications was her testimony that she read a book on the topic and watched an interview with the book's author on the internet.

The County, no doubt sensing trouble here, attempted to rehabilitate its own witness by asking the witness a standard, routine question in dealing with expert witnesses, specifically: "[D]o you know whether this book is a book that appraisers rely upon in determining detrimental conditions?" The response by the witness is remarkable: "I don't know." Nevertheless, the witness was allowed to testify as to detrimental conditions issues.

It is no surprise, then, given this failure of proof, when faced with a challenge to the witness's qualifications to testify as an expert, the County confined its defense, such as it was, to one sentence: "Respondent's expert also indicated and testified that she undertook the appropriate steps to complete the assignment competently, thus complying with the Competency Rule of USPAP and her testimony was accepted by the Tax Court."

Because of the procedural barrier to appeal here, and other issues on appeal, I do not quarrel with the decision of the

---

1. Expert opinion is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and the "witness [is] qualified as an expert by knowledge, skill, experience, training, or education." Minn. R. Evid. 702.

The qualification question has been the subject of review in our court and the Minnesota Court of Appeals. *See, e.g., Gross v. Victoria Station Farms, Inc.*, 578 N.W.2d 757, 760–62 (Minn.1998) (finding no abuse of discretion when district court excluded opinion of witness who, despite "extensive" experience with horses, had no experience diagnosing equine lameness of the sort at issue in the case, stating that the horse's history of lameness "underscores the complex nature of [its] current lameness and the need for competent expert opinions on the causation of such lameness"); *Kastner v. Wermerskirchen*, 295 Minn. 391, 395, 205 N.W.2d 336, 338 (1973) (finding no abuse of discretion in district court decision to exclude opinion of witness who, while qualified to diagnose the presence of a disease in animals, was not necessarily qualified to render opinion on causation and onset of the disease); *cf. Noske v. Friedberg*, 713 N.W.2d 866, 872 (Minn.App.2006), *rev. denied* (Minn. July 19, 2006) (noting that, while law professor's expertise in professional responsibility was "arguably relevant" in malpractice case against criminal defense attorney, the professor's "lack of practical or academic experience in the criminal-law area" would undercut admissibility at trial); *Block v. Target Stores, Inc.*, 458 N.W.2d 705, 709–10 (Minn.App.1990), *rev. denied* (Minn. Sept. 28, 1990) (finding reversible error in district court determination of architect as unqualified to give expert testimony regarding safety and design issues in retail store when architect had "practical experience and special knowledge" of safety and design issues).

majority not to analyze the expert witness testimony issue in detail. I write separately to join in the decision of the court but also to emphasize that this decision does not erode our evidentiary requirements for the admission of expert witness testimony as found in the Minnesota Rule of Evidence and our case law.

PAGE, Justice (concurring).

I join in the concurrence of Justice G. Barry Anderson.

ANDERSON, Paul H., Justice (concurring).

I join in the concurrence of Justice G. Barry Anderson.